## UNDERWOOD v. ISBRANDTSEN CO., Inc.

United States District Court
S. D. New York.
Oct. 15, 1951.

O'Brien, Driscoll, Raftery & Lawler, New York City, for libellant.

Corydon B. Dunham, New York City, for respondent.

CONGER, District Judge.

Libellant sues for unlawful and wrongful discharge. He sues to recover for nonpayment of his wages and subsistence from February 27, 1947 [the date of his discharge] to April 15, 1947 [the date when he obtained employment].

Respondent denies that the discharge was unlawful and wrongful and claims it was justified because libellant was not qualified to discharge the duties of Chief Engineer, but was incompetent and that by reason of his incompetence, negligence and failure to perform the duties required of him the vessel of which he had been Chief Engineer was seriously damaged.

This lawsuit involves libellant's actions and conduct as Chief Engineer of the S. S. Julien Poydras on a voyage which commenced on November 17, 1946 at Boston and ended at Vancouver on February 2, 1947. In the meantime the vessel had touched the following ports: Savannah, Aruba, the Canal Zone, Honolulu, Yokohama and Kobe, Japan and from there on its homeward journey to Vancouver, B. C.

The Julien was a liberty ship and owned by the Waterman Steamship Company, but on or about November 15, 1946 it had been taken over by respondent who operated it under a bare boat charter. Libellant, on the voyage of the Julien just preceding this one, had been the First Assistant Engineer. Just before this voyage started libellant was promoted to Chief Engineer of the Julien. He signed on as Chief Engineer on November 16, 1946.

The Master of the Julien was opposed to the employment of libellant as Chief Engineer. He preferred another man because he was more experienced. The Master tried to prevent the appointment of libellant as Chief Engineer but was unsuccessful.

This was libellant's first voyage as Chief Engineer. He had only obtained his license as Chief Engineer in June, 1946. Still, from his prior record he seemed to be well qualified and experienced. He was 50 years of age. He had been at sea since 1925. He had started as a wiper and worked his way up until finally he had

received from the Coast Guard his license as Chief Engineer. He had been a licensed First Assistant Engineer since September, 1943. He had been a Second Assistant Engineer for six or seven months. Before that he had been an acting Assistant Engineer working on waivers.

Somewhere in the interim he had been Chief Inspector for the Maritime Commission with the rank of Second Assistant Engineer. Since September, 1943 he had been on a number of ships as Assistant Engineer, among which were four liberty ships. He also took several short courses in a maritime school.

In addition, libellant claims double wages pursuant to § 596 of Title 46 U.S.C.A.

When libellant was discharged he was paid his full wages to date. He had nothing more coming except that he had a claim for wages he might have earned from the date of his discharge to the end of the voyage or until he obtained employment.

The above law was passed by Congress for the protection of seamen to secure prompt payment of seamen's wages and thus protect them from harsh consequences of arbitrary and unscrupulous action of their employers. The words of the Statute " * * * refuses or neglects to make payment * * * without sufficient cause" may not be interpreted to cover the situation presented here. Libellant was paid his earned wages. Failure to pay subsequent accrued wages at the conclusion of the ship's voyage does not justify exaction of double wages. Collie v. Ferguson, 281 U.S. 52, 50 S.Ct. 189, 74 L.Ed. 696; Page v. United States, 9 Cir., 177 F.2d 601. This part of the claim is disallowed.

Respondent's contention is that "libellant was not qualified, nor competent, to discharge the duties of Chief Engineer and libellant was discharged from said vessel by reason of his incompetency and for the safety of the vessel and the master, officers and crew thereof."

The burden of proving a justifiable discharge for the above reasons is upon respondent. I find that it has not met that burden.

If the Captain believed that the Chief Engineer was incompetent and that the safety of the ship and those on board were endangered he could have discharged him anytime during the voyage. He did not do so. At the most he wrote a letter on December 5, 1946 to the owners of the vessel in which he again reiterated his protest against the employment of libellant over another man whom he preferred because of his larger experience. He does refer to certain difficulties that had arisen in the engine room but at no time did he recommend or suggest that libellant be discharged.

He made no such recommendation until after the disaster of February 2, 1947 near Vancouver. Under date of February 12, 1947 the Captain wrote to the owners recommending the discharge of the Chief Engineer. His language was rather mild and rather general. His reasons given for the discharge of libellant were as follows: "In view of the somewhat unsatisfactory conditions that have existed in the Engine Department since the beginning of this voyage, it is recommended that the Chief Engineer also be relieved."

In his testimony [taken by deposition] in this case the Captain testified as follows:

"Q. Did you consider Mr. Underwood a competent Chief Engineer? [Objection]

"Q. I mean during the period of his service on the vessel. A. I didn't consider him as competent as several other chief engineers that I had sailed with.

"Q. And was your recommendation that he be relieved from duty as contained in your letter of February 12, 1947 motivated by personal reasons or by reason of the fact that you considered him incompetent? [Objection] A. The only reason the recommendation was made at that time was to have him replaced by what I thought would be a more competent man purely from the professional angle.

"Q. You were not satisfied with Mr. Underwood's capacity? A. Not particularly.

"Q. And was your opinion as to Mr. Underwood's capacity formulated and based upon the difficulties that you had during the

course of the voyage? [Objection] A. Yes.

"Q. And is it your belief, Captain, that if Mr. Underwood had been more attentive to his duties that much of the trouble might have been prevented? [Objection] A. It is quite possible, in my opinion, that another engineer might have located the root of the trouble that allowed salt to get into the feed line."

These words coming from the Captain are not too strong nor too convincing to cause me to come to the conclusion that the Chief Engineer was so incompetent that the Captain was justified in recommending his dismissal.

It is true that for at least the first half of the voyage there was considerable trouble with salt in the feed line. The Chief Engineer attributed the blame for this condition directly to the Master's failure to stop, as agreed in Lake Gatun, Canal Zone, so that the vessel could take on proper water. I am not ready to go along with the Chief Engineer on this contention. I think that the story is best told by the Second Engineer Sutter. He testified that after the vessel left Savannah he noticed the alkalinity in the boiler going up; that an excess of over 25 grains per gallon would effect the operation of the boilers and the tubes; that it cuts down efficiency, causes leaks and might cause an explosion; that when he discovered the salt in the water there were approximately 40 grains per gallon.

He told of the methods of correcting this situation by blowing the tubes and blowing down the boiler. He further testified that he told the Chief Engineer of the salt condition; that the Chief Engineer took a test of the water and also tried to find out what caused the trouble; that it was a process of elimination; that the condenser was tested and no leaks found there; that the various water tanks were tested and found to be salted; that all this took some time but it was finally discovered that the cause of all the trouble was a leak in the fore peak tank; that the fore peak tank was cut off and no longer used for boiler water; that from then on after three or four days, after things had been cleared up, there was no trouble with salt.

Due to the salt in the water it was necessary to blow down the boilers quite frequently. This necessitated the use of a lot of water. Because of this much more water was used than would be ordinarily required. As a result the vessel had to put in at Honolulu to take on water. On several occasions the vessel had to be slowed down for short periods while the boilers were being blown. This salt in the water with its consequent results may not be blamed to the Chief Engineer.

The Second Assistant Engineer very well expressed it when he testified:

"Q. Could you say that the fact the salt got into that tank through seepage could be attributed to the neglect of any one particular person? A. No, you couldn't pin that on to anybody because it's just one of those things. It might have struck the bottom and caused a breakage.

"Q. You couldn't say that that was the fault of Mr. Underwood, as Chief? A. No.

"Q. There is no doubt about it? A. No."

It was the further testimony of this witness that from the time the source of this leak was discovered the engineering department from the Chief down did everything they could to discover what caused the salt in the water and to correct the situation.

It is apparent that the motivating cause for the discharge of the Chief Engineer was the serious accident to the port boiler on the ship. When the vessel was about one day from Vancouver, B. C. the port boiler was found to be in a bad condition. It was without water. It might very well have exploded. The boiler was cut out and the vessel proceeded to Vancouver on one boiler. It was later discovered that the boiler and tubes were seriously damaged to such an extent that the ship was laid up for four weeks for repairs.

There was some difference of opinion as to what caused this damage. The consensus of opinion seems to be that the damage was caused by the boiler being fired when it was without water, because Rodriquez, the fireman-watertender had closed both check valves that fed the water to the boiler.

Of course, if the Chief Engineer was responsible in any way for this accident, his discharge was clearly indicated. I do not think he was, however. Rodriquez was clearly to blame. Because of his neglect there was no water in the boilers. The incident occurred in the early morning. The Chief was in his quarters which was usual. The damage could be caused in a short time—a matter of two or three hours.

The Captain recognized this. In a "note of protest" which he filed with the U. S. Consul he stated that the damage to the port boiler was the "result of the negligence" of the crew.

In his deposition the Captain verified this. He testified as follows:

"Q. On cross examination you were asked whether you deemed the fireman-watertender on duty and the first assistant engineer, Mr. Palmore, negligent and your answer to that was positive.

"Did you consider Mr. Underwood negligent?

[Objection]

"A. If you are referring to this immediate casualty I would say no."

The Captain had previously testified in his deposition that he thought that the fireman (Rodriquez) was negligent and that Mr. Palmore (the First Assistant Engineer) was negligent for not watching the firemen.

It should be noted that Palmore was discharged and Rodriquez demoted on or about February 6, 1947.

It is contended by respondent that libellant knew for some time that Rodriquez was careless or incompetent and that they should have discharged him or put him in a position of less responsibility.

In answer to this, libellant states that early in the voyage he called the Captain's attention to Rodriguez; that he told the Captain that the First and Second Engineers had called his attention to the fact that Rodriquez was careless and inattentive to his duties and that he was causing trouble in the engine room.

Libellant testified that he then went to the Captain and complained about Rodriquez and that he wanted a replacement for him, but the Captain said, "You know the trouble we will have with the Union 'about it.' Try and get along with him."

The Captain did not deny that this conversation took place. He simply stated he did not recall it.

Libellant testified that he then spoke to Mr. Palmore and told him to watch Rodriquez carefully and to try and get along with him.

Under the circumstances I cannot find libellant responsible for the fact that Rodriquez was not either discharged or demoted during the voyage, nor can I find him responsible for the careless acts of Rodriquez.

For the reasons set forth above, libellant is entitled to a decree awarding him his wages as Chief Engineer from the date of his discharge up to April 15, 1947 when he obtained employment, less the wages which he received as Assistant Engineer from April 2, 1947 to April 15, 1947, together with subsistence from the date of discharge to April 2, 1947 at the rate of $8 per day and costs.

Libellant's claim by way of set off is dismissed.

Settle decree.