**Peter J. LADZINSKI, Plaintiff,**

**v.**

**The SPERLING STEAMSHIP AND TRADING CORP., Defendant.**

**No. 66 Civil 1030.**

United States District Court
S. D. New York.

March 31, 1969.

---

Thomas J. Lukas, New York City, for plaintiff.

Zock, Petrie, Sheneman & Reid, New York City, for defendant, Edwin K. Reid, Howard McCormack, New York City, of counsel.

## OPINION

HERLANDS, District Judge:

In this action by an injured seaman, plaintiff seeks to recover unearned wages to the end of the voyage, maintenance and cure, and transportation. Plaintiff also demands the statutory penalty of double wages for alleged wrongful withholding of "wages" under 46 U.S.C. § 596 (1964).

For the reasons amplified in this opinion, the Court concludes that plain-

tiff is entitled to the claimed amounts of unearned wages, maintainance and cure, and transportation. However, his claim for double wages is dismissed because no "wages" within the meaning of 46 U.S.C. § 596 (1964) were withheld.

*The Complaint*

It is alleged that on March 12, 1965, the S.S. Mormacwren was sold to defendant in Chester, Pennsylvania and renamed S.S. East Hills. Plaintiff, who had been employed on the Mormacwren, signed coastwise articles as a third assistant engineer on March 12, 1965. The vessel made a voyage from Chester, Pennsylvania to New Orleans where, on April 8, 1965, plaintiff signed foreign articles for a voyage from New Orleans to the Far East (via the West Coast), and back to a port in the continental United States.

It is further asserted that plaintiff fell ill in the service of the vessel without any fault on his part, and was forced to leave the ship on April 27, 1965 at the port of San Francisco, California, where he was hospitalized. Plaintiff signed off the vessel for medical reasons on April 28, 1965, with a master's certificate.

The complaint charges that upon discharge, the master paid plaintiff his earned wages through April 28, 1965 but refused to provide for plaintiff's transportation back to Chester, Pennsylvania. Plaintiff took a three-day bus trip from San Francisco to Baltimore, Maryland, his home. He claims he made several demands upon defendant for maintenance and cure, transportation, and unearned wages to the end of the voyage. Defendant's only payment to plaintiff to date has been $160. for maintenance and cure from April 29, 1965 to May 17, 1965.

Plaintiff argues that, as an injured seaman, he is entitled to the following relief:[1]

(1) A sum of $1,257.00 which constitutes unearned wages from April 29, 1965 to June 16, 1965, the date upon which the voyage did in fact terminate. This claim is based upon the well-settled doctrine in admiralty that an injured seaman may recover the wages which he would have earned had he continued in the vessel's service.

(2) $392.00 for maintenance and cure from May 18, 1965 until July 6, 1965, the date upon which plaintiff claims he was declared fit for duty. This claim is also predicated on general American maritime law, which requires the owner of the vessel to provide for the maintenance and cure of an injured seaman until he is declared fit for duty. The sum of $392.00 was computed by using $8.00 per day as the base figure, this being the amount provided by the existing union agreement.[2]

(3) Transportation in the amount of $322.33. Plaintiff asserts that, under Section 29 of the union agreement, he is entitled to a sum for "transportation" which consists of first class transportation, subsistence at $10.00 per day for each day of travel, and wages for each day of travel back to Chester, Pennsylvania.[3]

---

1. Plaintiff's *Proposed Findings of Fact and Conclusions of Law* and *Plaintiff's Memorandum of Law* drop the fifth cause of action, which is for attorneys' fees incurred in connection with the claim for maintenance and cure.

   The *Pre-Trial Order*, dated February 27, 1968, limits plaintiff's original claim of $5,000.00 for maintenance and cure to $392.00.

2. Defendant does not dispute the fact that Plaintiff's Exhibit 1 entered into by the National Marine Engineers' Beneficial Association, District No. 1, (herein referred to as the "Union Agreement" or "Agreement"), was the union agreement in effect during the period relevant to this case. Pre-Trial Order, February 27, 1968, ¶ 3a. The Court notes that, for some unexplained reason, the Sperling Steamship Company, defendant herein, is not among the Dry Cargo Companies listed as signatories to the printed Union Agreement. Plaintiff's Exhibit No. 1, at 78–79.

   Section 35 of the Agreement sets the base figure for maintenance and cure benefits at $8.00 per day.

3. Section 29, subsection 1(a) of the Agreement calls for transportation back to the

(4) Double wages under 46 U.S.C. § 596. Plaintiff contends that the master's refusal to pay for the transportation requested and defendant's subsequent and continuous refusal to pay such transportation, were without sufficient cause and violate the statutory duty of prompt payment of "wages" under § 596, which imposes a penalty of "two days' pay for each and every day during which payment is delayed." Plaintiff seeks recovery of $77.20 per day for each day during the period beginning May 2, 1965 (four days after discharge) to the date when payment is actually made.[4]

At the trial, defendant tendered judgment in the sum of $1,257.00 to satisfy plaintiff's claim for unearned wages and $392.00 to satisfy plaintiff's claim for

maintenance and cure. Plaintiff accepted both tenders, which were made by defendant without admitting any of the facts underlying the claims.[5] The only claims requiring disposition by the Court are those for transportation and for the statutory double wages.

This opinion contains the findings of fact and conclusions of law which constitute the grounds of the Court's decision. Fed.R.Civ.P. 52(a).

*The Claim for Transportation*

The parties agree that the union agreement[6] (hereinafter "Agreement") controls the disposition of plaintiff's claim for transportation. They differ, however, in their interpretation of the Agreement, the controlling portions of which are set forth below.[7]

"original port of engagement", a term used in the maritime industry and defined in Section 29, subsection 1(b) of the Agreement as "the port in the United States where the licensed engineers [were] first employed by the Company regardless of where articles are signed or type of articles signed." This is apparently Chester, Pennsylvania, where plaintiff signed coastwise articles with defendant.

The parties have stipulated that Chester, Pennsylvania shall be considered as the port of original engagement. However, plaintiff's calculation of the amount of first-class transportation allegedly owed to him is based on the cost of pullman transportation via rail with lower berth to Baltimore, Maryland, plaintiff's home town. Because the defendant does not dispute that the fare is owed, or contest the amount demanded as fare by plaintiff, (*See* Opinion of the Court, *infra* at page 5), the Court simply points out the inconsistency.

4. The denial of this claim makes it unnecessary to discuss the correctness of the method utilized by plaintiff to arrive at a figure of $77.20, an amount which was contested by defendant.

5. Plaintiff has apparently brought a personal injury action against defendant in a Baltimore state court; and defendant does not wish to prejudice its defense against that suit by admitting any facts concerning plaintiff's injuries.

6. The Court notes the fact that Section 45(2) of the Agreement provides that the

Agreement "shall be, and be deemed to be, incorporated" in the Shipping Articles. It further provides that "appropriate notation thereof be made on the Shipping Articles." The foreign articles, signed in New Orleans on April 8, 1965, contain no such notation. This, however, is immaterial.

7. "Section 29. Transportation.
1. (a) When a vessel terminates a voyage at a port other than the original port of engagement, first-class transportation, wages and subsistence at $10.00 per day back to the original port of engagement shall be furnished to each licensed engineer officer who terminates his services aboard the respective vessel; provided, however, that licensed engineers on coastwise vessels shall not be furnished transportation to original port of engagement unless he has made a complete round voyage. Termination of a coastwise voyage shall be deemed to take place in the port where the vessel's final pay-off of her crew for the voyage takes place.

(b) The original port of engagement shall be the port in the United States where the licensed engineers [sic] first employed by the Company regardless of where articles are signed or type of articles signed.
* * * * *
(d) Transportation in accordance with this subsection of the agreement will be paid to licensed engineers whose services are terminated in a United States port other than the port of original engagement for legitimate illness or injury re-

Section 29, subsection 1(d) of the Agreement provides that a licensed engineer whose services are terminated for specified medical reasons in a United States port other than the port of original engagement is entitled to "[t]ransportation in accordance with this subsection of this agreement * * *." Plaintiff argues that the quoted phrase refers to subsection 1 of Section 29 of the Agreement, and more specifically to sub-subsection (a) of subsection 1, which contains a built-in definition of the "transportation" to be paid. The constituent elements as so defined are: (1) first-class transportation; (2) wages for each day of travel; and (3) subsistence at $10.00 per day. Plaintiff, therefore, claims $215.44 for first-class transportation to Chester, Pennsylvania; [8] $76.89 for three days' wages while travelling;[9] and $30. for subsistence,—a total of $322.33.

Defendant, on the other hand, claims that sub-subsection (d) of subsection 1 and sub-subsection (a) of subsection 1 are to be treated as completely separate and distinct, the former dealing with injured seamen, and the latter only with the termination of a voyage at a port other than the original port of engagement. Defendant contends that an injured seaman is entitled only to the cost of transportation back to the original port of engagement, i. e., the fare plus $10.00 a day for subsistence while travelling; that he is not entitled to "wages" as provided in sub-subsection (a) of subsection 1 of Section 29 of the Agreement because the general maritime law allows the injured seaman to recover unearned wages to the end of the voyage, and that to require an additional payment of wages for each day of travel would result in a double recovery of wages, which would not have been intended by the contracting parties.

Defendant's argument is unpersuasive. Both sides agree that sub-subsection (d) covers the "transportation" to be supplied to an injured seaman. However, while sub-subsection (d) itself does not itemize the constituent elements of "transportation", it expressly declares that "transportation in accordance with *this subsection*" (emphasis added) will be paid. The words "this subsection" mean subsection 1. Part of subsection 1 is sub-subsection (a). Nowhere in subsection 1, or anywhere else in Section 29, even under a most searching reading, is there any limitation of plaintiff's recovery to the items of first-class fare and subsistence. Sub-subsection (d) plainly serves the obvious purpose of enabling an injured seaman to recover "transportation" as defined in the Agreement, and, in the same manner as his more fortunate co-workers who, under sub-subsection (a), are returned uninjured to the port of original engagement upon the termination of the voyage.

The intendment of the Agreement is clear; there is no ambiguity. If the intention of the contracting parties were otherwise, as defendant argues, they failed to evidence such contrary intent in the document whose language now binds them.

Defendant's argument—that plaintiff would be receiving a windfall in the form

quiring hospitalization or out-patient hospital treatment.

    \*        \*        \*        \*        \*

3. First class transportation on land is defined as follows:

  (a) Pullman transportation via rail with lower berth on over-night trips.

  (b) Air transportation.

  (c) When first class transportation by rail or air is not available, bus facilities may be used."

8. Plaintiff claims $146.48 for pullman transportation via rail to Baltimore and $69.96 for lower berth under the scheme outlined in Section 29, subsection 3(a) of the Agreement. *See* Agreement, Section 29, subsection 3(a), *supra* at n. 7. Plaintiff actually took a three-day *bus* trip from San Francisco to Baltimore; and there is nothing in the record which clarifies his claim for reimbursement of the *rail* fare. Defendant does not, however, contest this portion of the claim. *See* Opinion of the Court, *infra* at page 5.

9. Plaintiff's wages, as set forth in the Shipping Articles of April 8, 1965, are $629.39 per month. The parties agree that this is equivalent to $25.63 per day.

of double wages during his period of travel—turns out, upon analysis, to be fallacious. Under Section 29, subsection 1(a) of the Agreement, when a vessel terminates a voyage at a port other than the original port of engagement, the seaman receives, in addition to his earned wages, a travel allowance consisting of wages for each day of travel plus fare and subsistence. Assuming *arguendo* that a hypothetical voyage continues for twelve months, and travel time to the port of original engagement is three days, the seaman apparently receives, under the contract, twelve months of earned wages plus three days' additional wages along with fare and subsistence. Defendant admits that this is clear. The seaman who is injured on the last day of the tenth month of the same hypothetical voyage, signs-off the ship, and travels to the port of original engagement during three days, would, using the Court's interpretation of Section 29 receive the following: ten months of earned wages; two months of unearned wages; and wages for each day of travel to the port of original engagement along with fare and subsistence. The injured seaman is thus placed in precisely the same economic position as the uninjured seaman who completes the voyage. No double wages are re-covered; both classes of seamen receive the transportation allowance which was bargained for under the union contract. This equality of treatment provided by the Court's interpretation demonstrates that defendant's construction of Section 29 is discriminatory and illogical.

The Court concludes that Section 29 of the Agreement entitles plaintiff to first-class transportation, wages for each day of travel to the port of original engagement, and $10.00 subsistence for each day of such travel. Plaintiff is granted judgment for the full amount of his claim for transportation, which is $322.33.

## The Claim for Penalty Double Wages

■ Plaintiff's final claim is for penalty wages under 46 U.S.C. § 596.[10] Defendant contends that, as a matter of law, the "transportation" which it allegedly withheld is not "wages" within the meaning of the statute and, therefore, the penalty cannot be invoked. The Court agrees with this construction of the statute. Consequently, there is no need to resolve the question whether defendant met the burden of proving sufficient cause for withholding transportation.[11]

---

10. R.S. § 4529, as amended, 38 Stat. 1164–1165, 46 U.S.C. § 596 (1964):
    "Time for payment
    The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens; and in case of vessels making foreign voyages, or from a port on the Atlantic to a port on the Pacific, or vice versa, within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens; and in all cases the seaman shall be entitled to be paid at the time of his discharge on account of wages a sum equal to one-third part of the balance due him. Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court; but this section shall not apply to masters or owners of any vessel the seamen of which are entitled to share in the profits of the cruise or voyage. This section shall not apply to fishing or whaling vessels or yachts."

11. The major portion of the trial testimony was on the issue of "sufficient cause" under 46 U.S.C. § 596 (1964). Two of defendant's witnesses testified about their understanding of 46 U.S.C. § 596 and Section 29 of the Agreement for the purpose of proving that their understanding led them in good faith and for sufficient cause, to deny plaintiff's demands for wages while travelling and his later demand for penalty wages. The Court places no reliance on this testimony in deciding whether, as a matter of statu-

The issue—whether "transportation" constitutes "wages", as that term is used in Section 596—requires the Court to muster the conventional tools of statutory interpretation. Before pursuing that inquiry, however, the Court considers it helpful to delineate the links in the chain of plaintiff's reasoning.

Stressing the fact that daily wages constitute a specified element of the transportation allotment defined in Section 29 of the Agreement,[12] plaintiff's first proposition is that the Agreement thereby treats transportation as part of the compensation of a seaman; and, hence, "transportation" should be equated with "wages". Plaintiff's second proposition—a non sequitur from the first—is that transportation should also be considered "wages" under 46 U.S.C. § 596. To buttress that proposition, plaintiff argues that the elastic concept of "wages" covers a broad spectrum of employee benefits. In support of a latitudinarian construction, plaintiff also points to the fact that seamen are wards of the court; that, traditionally, the court has adopted a liberal approach to legislation enacted for the protection of seamen; that this Court should, therefore, construe the term "wages" in the broadest possible manner; and that the Court should ultimately conclude that "transportation" is "wages" within the meaning of 46 U.S.C. § 596.

The Court rejects as unpersuasive plaintiff's contention that the Agreement itself deems transportation to be wages. Section 29 is entitled TRANSPORTATION. An entirely separate section is captioned WAGES.[13] Moreover, nowhere does the Agreement state, either expressly or impliedly, that the items recoverable as transportation are to be considered wages. Plaintiff can point only to the arithmetic fact that the seaman's daily wage enters into the computation of the transportation allowance.

The salient fact is that Section 7 of the Agreement, dealing with the seaman's monthly wages, i. e., his salary, speaks in terms of monies owing for services performed [14] and, occasionally, uses the word "salary" interchangeably with "wages".[15] The absence of similar language in Section 29 of the Agreement is a meaningful indication that the contracting parties did not regard "transportation" as synonymous with or as an item in the same category as "wages" to which they, in fact, assigned a rather narrow connotation.

The Court is not suggesting that the Agreement may not be read as broadly treating the transportation allowance as an employee benefit granted only in the light of the rendition of services. The critical circumstance, however, is that the Agreement categorizes "wages" only

---

tory interpretation, the transportation allowance constitutes "wages" under § 596.

12. Plaintiff does not limit himself to the contention that the wage element in Section 29, subsection 1(a) is the crucial factor which transforms "transportation" into "wages". Plaintiff's theory is more general: he urges that transportation is provided to the seamen in exchange for services rendered and is, therefore, one form of the "wages" earned by him. Thus, even assuming *arguendo* that the Court had denied the claim for three-days' wages as part of transportation, plaintiff would still contend that "transportation" constitutes "wages" under the Agreement, and under the statute.

13. *Agreement*, Section 7.

14. Id. at Section 7(f).

15. Id. at Section 7(d). Other sections of the Agreement support the inference that the Union Agreement does not consider transportation to be a part of wages. In Section 1, the provision dealing with replacement engineers refers to paying "all necessary transportation expense, wages and subsistence,"—thus differentiating between these items.

Section 4(a), dealing with discharge, states:

"Wages shall be deemed to include subsistence and room allowance for the period involved."

Section 4(c), dealing with payoff procedure upon discharge, provides for payment of the wages defined in section 4(a) by a certain time. Transportation is clearly not included in this definition, and is similarly treated as a separate item throughout the Agreement.

in the puristic and precise sense of that word and, therefore, it cannot be interpreted logically or practically so as to make "transportation" correspondent with "wages".

■ If *arguendo* plaintiff's interpretation of the Agreement were accepted, the Court is of the view that, in the circumstances of this case, the parties did not and could not contract to expand the meaning and coverage of the word "wages" in the penalty provision of the statute beyond that intended by the Congress.

It has been argued that, although maintenance and cure benefits have been held not to be "wages" within the meaning of 46 U.S.C. § 596, a union agreement which allegedly deems them to be wages can expand the scope of the statute. This Court has consistently refused to follow that line of reasoning.[16] *See, e. g.*, Mauri v. S.S. Sag Harbor, 227 F.Supp. 661 (D.Md.1964).

The Court now considers another branch of plaintiff's argument,—that, as a matter of statutory interpretation of 46 U.S.C. § 596, the word "wages" encompasses the cost of transportation.

"Wages" are defined variously as [a] "salary", "payment of a usually monetary remuneration by an employer for labor or services usually according to contract and on an hourly, daily or piecemeal basis and often including bonuses, * * * and amounts paid by the employer for insurance, pensions * * * and other benefits, * * *", Webster's Third New International Dictionary (1961); [b] "money that is paid or received for work or services", "earnings", and "emolument", The Random House Dictionary of the English Language (1967); and [c] "in maritime law the compensation allowed to seamen for

their service on board a vessel during a voyage", Black's Law Dictionary (4th ed. 1957).

The dictionary only highlights the generally recognized fact that the term "wages" may mean monetary salary alone or it may, in a given case, include some or all non-cash fringe benefits, which are prevalent in contemporary employment arrangements.

■ The statute must be interpreted in the light of its dominant purpose and policy. *See, e. g.*, In the Matter of Sleep Products, Inc., 141 F.Supp. 463, 468–469 (S.D.N.Y.1956); *aff'd sub nom.* Local 140 Security Fund v. Hack, 242 F.2d 375 (1957), *cert. denied,* 355 U.S. 833, 78 S.Ct. 51, 2 L.Ed.2d 45 (1957).

■■ The basic purpose of the Seaman's Acts 46 U.S.C. § 541 *et seq.* was to improve the surroundings and condition of American seamen. Committee on the Merchant Marine and Fisheries, H.R. Rep. No. 1657, 55th Cong., 2d Sess. 1–3 (1898). Section 596 in particular was intended to provide for the prompt payment of wages to a discharged seaman, *id.* at 3; See Collie v. Fergusson, 281 U.S. 52, 50 S.Ct. 189, 74 L.Ed. 696 (1930), to insure that he would not be turned ashore with little or no money in his pocket. *See* Malanos v. Chandris, 181 F.Supp. 189 (N.D.N.Y.1959). Because of his impecuniousness, the seaman was peculiarly exposed to arbitrary and sometimes unscrupulous acts of his employers, see Underwood v. Isbrandtsen Co., Inc., 100 F.Supp. 863, 865 (S.D.N.Y. 1951), who might pressure him to release claims by withholding sums to which he was indisputably entitled. *See, e. g.*, Prindes v. the S.S. African Pilgrim, 266 F.2d 125, 128 (9 Cir. 1959); Hume v. Moore-McCormack Lines, 121 F.2d 336 (2 Cir. 1941). The primary objective of

---

16. The parties cannot, without more, make the contract part of the statute. They cannot expand the scope of the statute by private contract. However, by appropriate language, the parties can, as a matter of private agreement, include in their contract provisions obligating the shipowner to furnish transportation im-

mediately upon discharge of a seaman; and imposing a "double wages" penalty upon the shipowner for breach of the contract.

The parties did in fact provide for penalty payments in certain cases of delay in payment of wages. *See* Union Agreement, Section 13(g).

§ 596 is to prevent such coercion by deterring a shipowner or master from improperly making a deduction from a seaman's wages. *See* Swain v. Isthmian Lines, Inc., 360 F.2d 81 (3 Cir. 1966).

For the general reason that seamen are wards of admiralty and the specific reason that § 596 is remedial in nature, many courts have stated that § 596 should be interpreted liberally. *See, e. g.,* Johnson v. Isbrandtsen Co., Inc., 343 U.S. 779, 782, 72 S.Ct. 1011, 96 L.Ed. 1294 (1951), *affirming*, 190 F.2d 991 (3 Cir. 1951); Bainbridge v. Merchants & Miners Transportation, 287 U.S. 278, 282, 53 S.Ct. 159, 77 L.Ed. 302 (1932); Mystic SS. Co. v. Stromland, 20 F.2d 342 (4 Cir. 1927);[17] cf. Calmar Steamship Corp. v. Taylor, 303 U.S. 525, 529, 58 S.Ct. 651, 82 L.Ed. 993 (1938); *see generally* E. C. Benedict, The Law of American Admiralty, § 621 at 282, Vol. 4 (6th ed. 1940).

However, with regard to the provision in § 596 for double wages, Judge Learned Hand (then a district judge) warned: "Still they [seamen] remain in some measure persons sui juris, and there is neither justice nor policy in aiding them to catch at penalties, where they have suffered no wrongs." Petterson v. United States, 274 F. 1000, 1003 (S.D.N.Y. 1921). *Cf.* The American Shipper, 3 F. Supp. 184, D.C., aff'd 70 F.2d 632 (2d Cir. 1934), *aff'd* as McCrea v. United States, 294 U.S. 23, 55 S.Ct. 291, 79 L.Ed. 735 (1935); Butler v. U. S. War Shipping Administration, 68 F.Supp. 441, 445 (E.D.Pa.1946) ["The essential purpose of Rev.Stat. § 4529, 46 U.S.C.A. § 596 is to penalize."].

A leading commentator, referring to the dual remedial and penal characteristics of § 596, states:

"The essential spirit and purpose of the statute are to financially punish the master and owner for neglectful failure to pay wages, and the sum is often far out of proportion to the actual unpaid wages involved. It can truly be said that the essential purpose is to penalize, and it is so regarded in the maritime industry; * * *" M. J. Norris, The Law of Seamen, § 382 (2d ed. 1962).

Regardless of the characterization of § 596 as remedial or penal, that provision must be construed so as to effectuate the legislative purpose of ameliorating the specific injustices that the Congress sought to eliminate. *Cf.* Zarraga v. Texas Company, 284 F.2d 657, 660 (3 Cir. 1960). The Court of Appeals for this Circuit has declared:

"The time has long since passed when platitudes as to 'plain meaning' or strictures as to the strict construction of penal statutes can procure judicial refusal to reach a result sufficiently indicated by the legislature's words." Postma v. Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, Local 294, 337 F. 2d 609, 610 (2 Cir. 1964).

Armed with a knowledge of the purpose of § 596 and the statute of which it is a part, the Court has examined various cognate sections to ascertain whether they illuminate the meaning of the word "wages"[18] in the context of this case.

---

17. All of the cited cases deal with the question whether specific conduct on the part of the master or shipowner constituted "sufficient cause" for withholding wages under § 596. They do not deal with the threshold issue whether a given item withheld is in fact "wages" under § 596. A liberal approach to the issue of "sufficient cause", which is by its nature a vague standard requiring case by case judicial definition, does not *ipso facto* lead to a similar approach on the issue before this Court.

18. The word "wages" is used frequently in 46 U.S.C. §§ 591–605. While the meaning of the word "wages" may vary slightly from section to section, depending on the context, the Court observes that the word is used consistently to connote salary only. For example, § 594 entitles a seaman who is improperly discharged before he earns one month's wages to one month's "wages" in lieu of damages for breach of contract. The term "wages" thus used is manifestly limited to salary as distinguished from fringe benefits.

46 U.S.C. § 593 (1964) deals with the situation where a seaman's employment is terminated before the end of the voyage on account of loss of the vessel or shipwreck. It provides for his transportation to the port of shipment, as provided in Sections 678 and 679. Sections 678 and 679 create the obligation of the United States Government to repatriate certain classes of seamen who are stranded in foreign ports. These provisions signify that the Congress, aware of the special problems facing seamen in connection with repatriation and transportation, sought either to improve or codify the existing law. *See generally* H.R.Rep. 1657, *supra* at 3.[19] The very use of the term "transportation" in the statute supports the thesis that the Congress did not employ the term "wages" in § 596 or in any other cognate section as including transportation, which was regarded as a separate and distinct problem. An examination of the mechanics of transportation in the maritime industry will avoid an abstract resolution of this issue.

The general maritime law makes no provision for repatriation of seamen shipwrecked abroad or for repatriation of sick or disabled seamen. *See* Norris, *supra* §§ 416, 417. Legislation enacted as early as 1872 created the right of the shipwrecked mariner to be returned from a foreign port to his home. Shipping Commissioners Act of June 7, 1872, c. 322, § 33, 17 Stat. 269. *Id.; see* Harvey v. Smith, 35 F. 367, 368 (S.D.N.Y.1888). In the absence of legislation, the seaman must look to the maritime case law for his protection. *See, e. g.,* The Hawaiian, 33 F.Supp. 985, 987 (D.C.Md.1940). While the case law on the question of transportation is far from clear, a brief survey will serve the Court's present purpose.

■ It would appear to be maritime case law that—in addition to maintenance, cure and wages to the end of the voyage—a sick or disabled seaman is entitled to be transported home at the expense of the ship. *See,* The Centennial, 10 F. 397 (E.D.La.1881); Norris, *supra* § 417. Although it is clear that this principle protects a seaman discharged in a foreign port it is not equally clear that such protection is applicable to a seaman who is discharged for illness at a port within the United States other than the port of original sign-on.[20] The

19. The statutes deal only with the Government's obligation to provide return transportation from a *foreign port* to the United States, and not with transportation from one port in the United States to another. The latter matter is left to the case law and/or to the contracting parties.

20. The William Penn, 1925 AMC 1316 (E.D.N.Y.1925) and Miller v. United States, 51 F.Supp. 924, 925 (S.D.N.Y. 1943) merely decided, without discussion, that the injured seamen in the particular cases were entitled to transportation to the port of shipment. The cases do involve seamen discharged in ports within the United States. However, the opinions do not disclose whether the duty to furnish transportation arose under the shipping articles or a union contract, or was an obligation imposed by law on a non-contractual basis.

In The Hawaiian, 33 F.Supp. 985 (D. C.Md.1940), the court considered the question of whether an injured seaman's conduct (when he was discharged, he obtained other employment) can ever be viewed as evidencing his election not to return to the home port and thus not to claim transportation. In deciding in favor of the seaman, the court summarized (33 F.Supp. at 987) its view of "the sound rule":

"The seaman is entitled to be transported free of charge back to the port where he originally signed on, provided he makes the demand for such transportation within a reasonable time after he has recovered his health, * * *."

The case, called "a close one" by the court, involved transportation from one port in the United States to the port of sign-on in the United States and relied on admiralty doctrine rather than on any union agreement between the shipowner and the seaman.

The paucity of reported cases on the precise point does not, however, warrant the conclusion that it is well-settled that the injured seaman has the right to be

problem may, in fact, be academic because many union agreements or shipping articles provide for transportation and, consequently, the seaman can rely on his contract. *See, e. g.*, Nelson v. Moore McCormack Lines, Inc., 201 F. Supp. 40 (S.D.N.Y.1961), *aff'd*, 297 F. 2d 936 (2d Cir. 1962); Norris, *supra* § 426, n. 7, § 436, n. 1.

■ A seaman who is improperly discharged at a foreign port is entitled to recover transportation to either the final port of discharge or the port of shipment. *See, e. g.*, The Mount Everest, 17 F.2d 479 (5 Cir. 1927); Alaska S.S. Co. v. Gilbert, 236 F. 715 (9 Cir. 1916); *cf.* Schwark v. S.S. Rio Macareo, 249 F. Supp. 375 (E.D.La.1966); Sellers v. U. S. Lines Co., 89 F.Supp. 254, 256 (N.D. Cal.1949); The Herbert L. Rawding, 55 F.Supp. 156 (E.D.S.C.1944). It cannot be asserted dogmatically, however, that this protective principle extends to the wrongful discharge of a seaman in a port within the United States. The rationale for recovery, essentially one of damages for breach of contract, would seem to warrant application of the principle without regard to the place where the improper discharge occurred.

Transportation is sometimes provided for in the shipping articles, but more frequently is a major subject in a union agreement. The reported cases disclose that the union agreement usually codifies the legal duties of the shipowner with regard to transportation, but often goes further by requiring the owner to furnish transportation where the law imposes no duty.[21] Moreover, the union agreement may obligate the shipowner to pay subsistence to the seaman and a daily wage stipend while travelling, in addition to the general provisions for return passage, all under the heading of "transportation."

At this point of the discussion, it would be helpful to examine some practical aspects of the mechanics of furnishing transportation.

The reported authorities indicate that the injured seaman is customarily brought home through arrangements made by the shipowner himself. The owner secures return passage from a foreign port, possibly on one of his ships, or, where the discharge is within the United States, he furnishes the seaman with a plane or rail ticket. There is, in fact, rarely a need to pay the seaman any cash in such situations.[22] In addition, there may understandably be a delay between the time when the seaman is discharged from the hospital or from the ship and the time it takes the employer to secure return passage.[23]

Similarly, where a seaman is entitled to transportation because of improper discharge, he will rarely receive any payments or even return transportation at the time of his discharge, but will most likely be compelled to litigate his right

transported back to the port of original sign-on where he is discharged for injury within the United States.

21. For example, Section 29 of the Agreement provides for transportation of a seaman from a port in the United States to the original port of engagement upon termination of the voyage in its normal course.

22. Likewise, where a union contract exists, the provisions ordinarily obligate the shipowner to furnish transportation via air or rail, rather than to pay any cash. Payments of cash are, however, made where the union agreement calls for additional items, such as subsistence or a daily wage allowance. Cash may also be paid where the agreement allows the seaman to elect to take a liquidated sum in lieu of transportation.

23. Section 35 of the Agreement provides, for example, for the manner of maintenance and cure payments during this "waiting period":
    "(b) In the event a licensed engineer must leave his vessel in a foreign port because of illness or injury * * * he shall receive $8.00 per day maintenance and cure from the time of his discharge from the hospital until return transportation is made available."

to transportation after his employer's refusal to provide it.[24]

The foregoing discussion of the "when" and "how" of transportation highlights an important practical fact: that transportation is clearly not an item which is likely to be paid or furnished immediately upon the seaman's discharge, or within four days after his discharge, or indeed at any fixed time.

By way of summary then, firstly, transportation is usually *furnished* by the shipowner and no cash is actually transferred; and, secondly, some time may elapse after discharge before the owner can provide adequate transportation. Section 596, which requires prompt payment of wages, cannot logically be applied to transportation. This conclusion is fortified by the separate treatment of transportation in the Seaman's Acts 46 U.S.C. § 541 *et seq.* itself. *See* Opinion of the Court, *supra* at 13–14.

The above-indicated conclusion is supported by other decisions considering the question of the meaning of "wages" as used in § 596.[25]

It has been held that the shipowner's duty of prompt payment of "wages" under § 596 does not apply to the unearned wages due to the seaman injured in the service of the vessel, *see, e. g.,* Yoffe v. Calmar S.S. Corp., 23 F.Supp. 629 (N.D.

Cal.1938); Norris, *supra* § 404; or to the maintenance and cure benefits owed to the same seaman. *See, e. g.,* Isthmian Lines, Inc. v. Haire, 334 F.2d 521 (5 Cir. 1964); Clinton v. Joshua-Hendy Corp., 277 F.2d 447 (9 Cir. 1960); Page v. United States, 177 F.2d 601 (9 Cir. 1949); Mauri v. S.S. Sag Harbor, 227 F.Supp. 661 (D.Md.1964); see generally Norris, *supra* §§ 404, 576.

Payment of earned wages at the time of discharge on account of illness constitutes the performance of the shipowner's statutory duty to the seaman; and no penalty can be assessed for the withholding of unearned wages, due to him subsequent to the date of discharge. Analogously, where a sailor is improperly discharged, the shipowner executes his statutory duty by tendering earned wages upon discharge. When a court finally determines that the discharge was, in fact, wrongful, the seaman may recover unearned wages to the end of the voyage, but no penalty applies. *Cf.* Forster v. Oro Navigation Co., 128 F.Supp. 113 (S.D.N.Y.1954), *aff'd,* 228 F.2d 319 (2 Cir. 1955).

The rationale of these holdings is two-pronged. The first reason—which relates to unearned wages—is that the date upon which a voyage will in fact terminate is not capable of determination[26]

---

24. Where the owner is aware of the fact that the discharge is improper, but for some reason wishes to terminate the contract with a seaman, he may provide the seaman with passage money home. For the most part, the litigated cases involve situations in which the employer contends that the discharge was proper and that, therefore, he was not obligated to furnish transportation. In such situations, it is unreasonable to expect an employer to provide transportation immediately upon discharge; and the seaman's only remedy is to recover after a court declares the discharge to have been improper.

25. The authorities have unanimously held that a "war bonus" is "wages" within the meaning of § 596. The essential character of the so-called "bonus" is additional wages for extra-hazardous service and is, in

reality, an integral part of the seaman's wages and not a typical bonus payable at the discretion of the employer. The label "bonus" in no way alters this reality; and, consequently, the withholding of a war bonus without sufficient cause gives rise to the double wage penalty under the statute. *See, e.g.,* Glandzis v. Callinicos, 140 F.2d 111 (2 Cir. 1944); Lakos v. Siliaris, 116 F.2d 440 (4 Cir. 1940); The Herbert L. Rawding, 55 F. Supp. 156 (E.D.S.C.1944).

These cases do not aid plaintiff's contention that transportation is "wages". If anything, they cut the other way and lend support to the proposition that the word "wages" is confined to salary.

26. Most shipping articles do not specify a specific termination date, but rather provide that the voyage will last for a

when a seaman is discharged on account of illness. Therefore, claims for payment of unearned wages will not actually be settled until the voyage shall have been completed. Congress could not have intended § 596 to apply to such unearned wages which cannot, as a practical matter, be paid immediately upon discharge.[27] *See, e. g.*, Yoffe v. Calmar S.S. Corp., *supra.*

Similarly, even after the obligation to pay maintenance and care arises, payments are made only for so long as maintenance and cure costs are in fact incurred; and the amounts owed to an injured seaman cannot be ascertained and calculated upon his discharge. On the contrary, periodic claims are filed with the owner. *See, e. g.*, Robinson v. Swayne & Hoyt, Ltd., 33 F.Supp. 93, 94–95 (S.D. Cal.1940).

■ The second reason articulated by the authorities for holding that maintenance and cure and also unearned wages are not "wages" within the meaning of § 596 has been expressed in the following words:

"This statute [§ 596] obviously refers to earned wages under the contract memorialized by the shipping articles. It has no relation to M-W-C wages which, springing out of the relationship of ship and seaman, not the employment contract, reflect the law's concern for the seaman becoming sick, disabled or ill in the service of the ship. Gilmore & Black, Admiralty, §§ 6–6, 6–13, at 253, 271 (1957); Norris, The Law of Seamen, §§ 543–48 (2d ed. 1962); Cortes v. Baltimore Insular Line, 1932, 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368, 1933 A.M.C. 9; Calmar Steamship Corp. v. Taylor, 1938, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993, 1938 A.M.C. 341; The Osceola, 1903, 189 U.S. 158, 175, 23 S.Ct. 483, 47 L.Ed. 760."

Isthmian Lines, Inc. v. Haire, 334 F.2d 521, 523 (5 Cir. 1964), *aff'd*, 231 F.Supp. 606 (S.D.Tex.1963).

The duty to provide maintenance and cure and unearned wages is thus regarded as one implied and imposed by law; they are not "wages" in the same sense as wages which have been expressly agreed upon in consideration of services rendered. Even if the contract between the seaman and the shipowner makes no provision for maintenance and cure and unearned wages, they are recoverable under the general maritime law. But these items do not fall within the ambit of legislative concern for prompt payment of earned wages.

Both of the foregoing reasons are equally applicable to the item of "transportation". If the general maritime law requires the shipowner to transport the injured seaman from a port of discharge within the United States to the port of sign on irrespective of any contractual obligation, then "transportation" is closely analogous to the items of maintenance and cure and unearned wages; and, by force of the second reason discussed above, should not be treated as "wages" under § 596.

However, even if "transportation" is a matter governed by contract alone, the Court holds that "transportation" is not "wages" within the meaning of § 596. The Court's discussion of the practical mechanics for the payment of transportation demonstrates that, like the payment of maintenance and cure and unearned wages, transportation is not an item that

___

time not exceeding a specified number of months. The termination date cannot, therefore, be known until it is reached. *See* Norris, *supra* § 112.

27. Furthermore, the shipowner may in some instances doubt the legitimacy of the seaman's illness and wish to conduct an investigation before paying the claim for unearned wages. Prompt payment of the undisputed portion of a seaman's wages—the wages earned until the date of discharge—should, in such a case, satisfy the statutory duty imposed by § 596, leaving the owner free to make adequate inquiries into the seaman's claim.

is paid immediately upon the seaman's discharge.

To recapitulate, the Court's conclusion is reached through an analysis of the history of the item of "transportation" in the general maritime law, a consideration of the practical manner in which transportation is furnished, and an inquiry into the treatment of the subject of transportation in the Seaman's Acts 46 U.S.C. § 541 *et seq.*

In the interest of complete discussion, the Court notes that extensive research has uncovered no cases in which a seaman requested penalties under § 596 for the wrongful withholding of "transportation".[28]

The Court hereby grants the plaintiff's claims for unearned wages in the amount of $1,257.00; maintenance and cure in the amount of $392.00; and transportation in the amount of $322.33. The Court hereby denies plaintiff's claim for penalty double wages.

Judgment shall be entered forthwith in accordance with this opinion.

28. Plaintiff argues that Johnson v. Isbrandtsen Co., 91 F.Supp. 872 (E.D.Pa. 1950) controls the issue, for the asserted reason that the case holds that transportation is an item of wages under § 596. The case is unpersuasive. It involved a seaman's claim for earned wages which had not been paid by the master who had deducted a claim against the seaman for damages from these earned wages. The district court held that such a set-off was improper under § 596, and earned wages were awarded. The double wages sought for improper withholding of wages under § 596 were not awarded, the court finding that the circumstances demonstrated sufficient cause for the withholding.

The seaman additionally claimed a liquidated amount for transportation under a union contract, which was awarded by the court, holding that a set-off against transportation was likewise improper. The rationale, as stated is: "This figure (transportation) must be considered an item of wages within the meaning of § 596, and, therefore, what has been said with respect to the respondent's defense to the wage claim applies to the claim for transportation." 91 F.Supp. at 874. (No claim for penalty for wrongful withholding of transportation had been entered).

On appeal to the Third Circuit, the case was affirmed, the sole issue being the availability of set-off. 190 F.2d 991 (3 Cir. 1951). The Supreme Court, affirming the Circuit Court, again, only on the question of set-off, states: "[P]etitioner's counterclaim may not be set off against the allowance made to respondent for transportation to his port of signing on. That allowance is proportionally as important to him and to his welfare as is the balance due him for earned wages." 343 U.S. 779, at 789 n. 12, 72 S.Ct. 1011, at 1017, 96 L.Ed. 1294 (1951). The Supreme Court thus implicitly rejected the district court's statement that a set-off could not be made against transportation, for the reason that transportation is "wages". On the contrary, the Supreme Court treated transportation as an allowance, separate and distinct from " * * * the balance due him for earned wages", but considered the item important enough to disallow the set-off. This case supports this Court's conclusions and is the closest any case has come to an actual holding that transportation is not wages within the meaning of § 596.